UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES CORNELIUS BROWN,

        Petitioner,                Case No. 19-cv-10975
                                        Hon. Matthew F. Leitman

v.

LES PARISH,

        Respondent.

_____/

## ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF No. 1), (2) DENYING CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner James Cornelius Brown is a state prisoner in the custody of the Michigan Department of Corrections.  On April 1, 2019, Brown filed a petition for writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254. (*See* Pet., ECF No. 1.)  Brown, proceeding *pro se*, seeks relief from his convictions for four counts of first-degree murder, two counts of disinterment, mutilation, defacement, or carrying away of a human body, arson of real property, and arson of personal property.  (*See id.*)  Brown seeks habeas relief on the grounds that his custodial statements were involuntary, unconstitutional limitations were placed on his cross-examination of a prosecution witness, the prosecutor knowingly allowed perjured testimony, and his trial counsel was ineffective. (*See id.*)

1

The Court has carefully reviewed the petition and concludes that it does not state a claim upon which relief may be granted.  Therefore, the Court **DENIES** the petition.  The Court also **DENIES** Brown a certificate of appealability, but it **GRANTS** him leave to proceed *in forma pauperis* on appeal.

## I

Brown's convictions arise from the deaths of four women.  The Michigan Court of Appeals summarized the relevant factual background as follows:

> This case involves the deaths of four women, Renisha Landers, Demesha Hunt, Natasha Curtis, and Vernithea McCrary. On December 19, 2011, officers reported to 14499 Promenade Street on the east side of Detroit after receiving a call that two women were found dead in the trunk of a vehicle. The vehicle was a gray Chrysler 300 and was backed into an empty, open garage by a vacant house.  The police discovered the vehicle was registered to Renisha Landers by running its identification number through the Michigan Law Enforcement Information Network.  The women were later identified as Renisha Landers and Demesha Hunt.
>
> On December 25, 2011, police and fire personnel reported to 14903 Lannette Street on the east side of Detroit in response to a call that a vehicle was on fire, and discovered two badly burned bodies in the trunk of the car. The vehicle was a 1997 Buick LaSabre that was backed into an empty, open garage next to a vacant house.  Both the vehicle and the garage were damaged by the fire. Lieutenant Dennis Richardson, a fire investigation expert, testified that he believed the fire was caused by human hands because there were no alternative electrical or mechanical sources.  The vehicle did not have a license plate.  The bodies in the trunk were later identified as Natasha Curtis and Vernithea McCrary.

A homicide task force began investigating both incidents together after recognizing similarities between the age and race of the victims, the location and manner of disposal of the bodies, and that all of the women except Hunt had ads on Backpage.com, a website where persons could solicit sexual services. After obtaining the victims' cell phone records, the police discovered one common phone number between the two groups of women, which was registered to defendant. The police also learned that defendant frequently got new cell phones, made several calls relating to sexual services websites in December 2011, and grew up four blocks from where the bodies were recovered.

On May 1, 2012, defendant was arrested in connection with the women's deaths. At the time, defendant was living with his mother in Sterling Heights. Defendant was booked and transported to the homicide unit where Detroit Police Detectives Ernest Wilson and Derryck Thomas interviewed him. Before questioning began, Wilson went over defendant's constitutional rights using a standard form, and defendant signed the form. The first interview ended when defendant demanded an attorney. Defendant was transferred to another location for the night. The next day, Thomas and Detective Sergeant Kenneth Ducker arrived to transfer defendant back to the homicide unit for a buccal swab. According to Ducker and Thomas, during or just before transport, defendant said that he wanted to talk to the police. When they arrived at the homicide unit, Thomas reviewed defendant's constitutional rights, and defendant signed a second written acknowledgement form.

During the second interview, defendant admitted that Landers and Hunt came to his home after he initiated contact through Backpage.com. Defendant said when the women arrived, they smoked marijuana together, and he paid one of the women for sex. Defendant said he fell asleep, and when he woke up, he felt nauseous and found both of the women dead. Defendant admitted that he drove

the women's car into his garage, loaded their bodies into the trunk, disposed of one of the women's clothing in the trash, then drove the car to the east side of Detroit and dropped it off near where he grew up.  Defendant insisted that he did not kill the women, instead suggesting that the marijuana they smoked must have been tainted.

Defendant said that a few weeks later, he contacted McCrary through Backpage.com and McCrary and Curtis came to his home and they smoked marijuana together. Defendant said he fell asleep in his basement, and when he woke up, both of the women were dead.  Defendant admitted that he put the women's bodies in the trunk of their car, drove into Detroit, poured gasoline over the trunk and rear of the vehicle, and set it on fire with a lighter. Defendant said he disposed of the women's personal belongings in the trash at his home.

*People v. Brown*, 2015 WL 5568389, at ** 1-2 (Mich. Ct. App. Sept. 22, 2015).

A jury convicted Brown of four counts of first-degree murder, Mich. Comp. Laws § 750.316(1)(a), four counts of disinterment, mutilation, defacement, or carrying away of a human body, Mich. Comp. Laws § 750.160, one count of arson of real property, former Mich. Comp. Laws § 750.73, and one count of arson of personal property worth more than $1,000 but less than $20,000, former Mich. Comp. Laws § 750.74(1)(c)(i).[1]  *See id.*  The state trial court sentenced Brown to a

---

[1] The Michigan Court of Appeals explained amendments to the statutes of conviction as follows:

Defendant was charged and convicted under former MCL 750.73 and MCL 750.74(1)(c)(i).  In 2012, the Legislature passed 2012 PA 531 and 2012 PA 532, both effective April 3, 2013, which reorganized these crimes under new

term of life without parole for each of the four first-degree murder convictions, 57 to 120 months for each of the disinterment, mutilation, defacement, or carrying away of a human body convictions and for the arson of real property conviction, and 36 to 60 months for the arson of personal property worth more than $1,000 but less than $20,000 conviction. *See id.* at *1.

Brown appealed his convictions and sentence to the Michigan Court of Appeals.  He claimed: (i) the admission of his custodial statements violated his rights against self-incrimination and due process, (ii) the trial court violated his rights to cross-examination and a fair trial, (iii) the trial court erred when it admitted text messages despite the prosecution's discovery violation, and (iv) insufficient evidence supported his convictions.  The Michigan Court of Appeals held that insufficient evidence supported two of Brown's convictions for disinterment, mutilation, defacement, or carrying away of a human body and ordered those convictions vacated.  *See id.*  The court affirmed Brown's conviction and sentence in all other respects.  *See id.*  The Michigan Supreme Court then denied Brown's application for leave to appeal. *See People v. Brown*, 878 N.W.2d 878 (Mich. 2016).

---

statutory designations. Arson of a building or structure is now a crime under MCL 750.74, and arson of personal property worth more than $1,000 but less than $20,000 is a crime under MCL 750.75(1)(a)(i).

*Brown*, 2015 WL 5568389, at *1.

5

Brown thereafter filed a motion for relief from judgment in the state trial court. In that motion, Brown argued that the prosecutor elicited perjured testimony and allowed it to go uncorrected and that appellate counsel was ineffective for failing to raise that claim on appeal. (*See* St. Ct. Mot. ECF No. 10-22.)  The trial court denied the motion. (*See* St. Ct. Order, ECF No. 10-25.)  The trial court also denied Brown's motion for reconsideration. (*See* St. Ct. Order, ECF No. 10-27.)  Brown then sought leave to appeal in the Michigan Court of Appeals and the Michigan Supreme Court, but both courts denied leave. *See People v. Brown*, Mich. Ct. of Appeals Case No. 339422 (Mich. Ct. App. Jan. 11, 2018); *People v. Brown*, 914 N.W.2d 919 (Mich. July 27, 2018).

On April 1, 2019, Brown filed this federal habeas petition (*See* Pet., ECF No. 1.)  He seeks habeas relief on the following claims: (i) his custodial statements were involuntary because police questioned him after he invoked his right to counsel and his statements were induced by police coercion, (ii) he was denied his right to confrontation, to present a defense, and to a fair trial when the state trial court limited the scope of cross-examination of Detective Thomas, (iii) the prosecutor knowingly presented perjured testimony during the state court evidentiary hearing, and (iv) his trial counsel was ineffective for failing to object to the prosecution's presentation of perjured testimony.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal courts to uphold state court adjudications on the merits unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## III

### A

The Court begins with Brown's claim that his custodial statements were involuntary. The factual background and procedural history of that claim is as follows. Brown was interviewed by police on May 1 and 2, 2012. During the May 2nd interview, Brown confessed that after he contacted the victims (Renisha Landers, Demesha Hunt, Natasha Curtis, and Vernithea McCrary) through the website Backpage.com, they came to his mother's home. He denied killing the women, but he admitted that after falling asleep for a period of time, he woke and

7

found the women dead.  He also admitted to disposing their bodies by abandoning two vehicles in Detroit.  Brown now asserts that his May 2nd statement was involuntary because police continued to question him after he invoked his right to counsel. He also claims that his May 2nd statement was coerced by police threats and promises.

Prior to trial, Brown's trial counsel moved to suppress the May 2nd statement. The trial court held a pre-trial hearing (known as a "*Walker* hearing") during which Brown and four police officers testified.  The four testifying police officers were: Detective Derrick Thomas, Sergeant Ernest Wilson, Jr., Detective Sergeant Lil Drew, and Detective Sergeant Kenneth Ducker.

Brown testified that he was interrogated twice after he invoked his right to counsel: by Thomas and Drew on May 1st in a precinct back room and by Thomas and Ducker when they transported him to the homicide division on May 2nd. (*See* ECF No. 10-7, PageID.1147-54, 1155-62.)  Brown said that he did not initiate a conversation with police at any time after invoking his right to counsel.  He also testified that he ultimately decided to make a statement on May 2nd because, during the May 1st interview, police said that they could charge his mother with a crime and, during the May 2nd transport, police said they would charge his mother with a crime.  (*See id.* at PageID.1156-1157, 1188-1191.)

Detectives Thomas and Wilson testified that the May 1st interview ended when Brown requested counsel. (*See* ECF No. 10-6, PageID.1071, 1089.)  Thomas and Drew further denied questioning Brown in a back room. (*See id.* at 1089-1090; ECF No. 10-7, PageID.1218-1219.)   Finally, Thomas and Ducker denied questioning Brown during the car ride on May 2nd. (*See* ECF No. 10-6, PageID.1098; ECF No. 10-7, PageID.1248-1249.)

The trial court found the police officers' testimony credible and Brown's testimony not credible.  Based on those findings, the court held that Brown's statement was voluntarily given.  On direct review, the Michigan Court of Appeals affirmed:

> Defendant does not contest that his waiver was knowing and intelligent; thus, the only issue is whether defendant's statements were voluntary under the totality of the circumstances.  At the time of the interrogation, defendant was a 24-year-old man with a high school diploma and a grade point average of 3.2.  Although defendant did not have previous experience with the police, he testified that he went over the constitutional rights form, signed it, and understood what his rights were.  In fact, defendant invoked his right to an attorney during the first interview. Defendant testified that he was not under the influence of drugs or alcohol at the time.  He was subject to less than seven hours of interrogation over a 48-hour period, and did not appear to be lacking food, water, medication, or sleep. Officers ensured that defendant had his glasses on both days so he could see.  Wilson got defendant a more comfortable chair when he realized he was a large man. Detective Sergeant Lil Drew testified that after defendant invoked his right to an attorney, he was allowed to call his mother.

Defendant argues that the interrogating officers made promises and assurances that they would help him if he made a statement. The record does not reflect the presence of such promises. During the first interview, Thomas stated the following:

> James. James, listen to me. The tough way to say go ahead and do it. The result of me doing you is you're going away for the rest of your life, and never have a chance to tell me what it is I need to know to get you out of the mess. Because if you want to take the high road then rightfully so, we go ahead and charge you and send you on your way.

This statement is not a promise of leniency or a promise that Thomas would help defendant if he agreed to make a statement. This Court has held that a police officer telling a defendant that "he would do what he could to help and that things would go easier for defendant if he would cooperate and tell the truth" did not render subsequent incriminating statements involuntary. *People v. Ewing* (On Remand), 102 Mich.App 81, 85–86; 300 NW2d 742 (1980).

Defendant argues that the officers induced him to make a statement by promising that he would not be charged with homicide. Before making his statement, defendant asked multiple questions about what charges would be brought against him. In response, the officers informed defendant that they were not responsible for bringing the charges against him, and they did not know what the final charges would be. After defendant made his statement, the officers commented that they did not see murder from his description of events, but they also emphasized that they were not responsible for choosing the charges.

Defendant contends that the officers deceived him throughout the interviews. Although the officers said many untruthful things, including that they had video of

defendant driving the women to Detroit, that they would not lie to defendant, that the interview was not being recorded, and that they believed defendant's description of the events, the mere fact that the police are untruthful during an interrogation does not render subsequent statements involuntary. *People v. Hicks*, 185 Mich.App 107, 113; 460 NW2d 569 (1990). It is not improper for the police to use psychological tactics when conducting an interrogation. *Haynes v. Washington*, 373 U.S. 503, 514-515; 83 S Ct 1336; 10 L.Ed.2d 513 (1963).

Defendant asserts that he was coerced into making a statement because Thomas threatened to charge his mother. During the first interview, Thomas stated the following:

> Here is the funny thing. I don't know if this mean a lot to you, like it may mean to me but my mom means a lot to me. Do you know right now I can charge your mama right now. You know, right now your mama could be in custody in two or three minutes ... [b]ecause it was her home.

> I'm talking to you man to man, cuz', do you understand that we are going to charge your mama with the same thing. You all be together.

Defendant then invoked his right to an attorney and the interview ended.

Defendant correctly points out that threats against an accused's family may render an incriminating statement involuntary.[ ] Although Thomas's comments in this regard were not commendable, we conclude that they were not egregious enough to overcome the voluntariness of defendant's statements the next day. After Thomas made the comment about defendant's mother, defendant stated, "You all got to do what you got to do," and invoked his right to an attorney. Defendant chose not to make a statement as a direct result of Thomas's comment, instead

choosing to invoke his rights and leave the interview. According to Ducker and Thomas, there were no additional comments about defendant's mother the next day before he offered to speak to the police. Rather, when asked why he wanted to make a statement, defendant affirmed that he simply wanted to get something off his chest.

Defendant argues that his statements were involuntary because he was subject to continuing interrogation in a back room on May 1, 2012, after he invoked his right to an attorney. At the *Walker* hearing, Drew and Thomas both denied that defendant was interrogated in a back room after his first interview. When a factor affecting the voluntariness of an incriminating statement is dependent on the credibility of witnesses, we defer to the trial court's determination on the matter. ... In this case, the trial court found that Drew's and Thomas's testimony was more credible on the issue of whether defendant was questioned in a back room after he invoked his right to an attorney.

Finally, defendant contends that Ducker's and Thomas's testimony was contradictory concerning when and how he offered to make a statement. At the Walker hearing, Thomas testified that as they were driving, defendant said, "Hey, I got to talk." Ducker testified that defendant said he wanted to talk when they were "[i]n the parking lot, walking to the car." At trial, Thomas testified that defendant said he wanted to talk as they "were exiting out of the Precinct and into the car." Later on, Thomas testified that defendant said he wanted to talk as they were getting into the car, but before he started driving. The relatively minor inconsistencies in the officers' testimony as to when defendant offered to talk do not appreciably undermine the trial court's conclusion that defendant voluntarily waived his *Miranda* rights. Under the totality of the circumstances presented above, the interrogating officers' conduct was not egregious enough to overcome defendant's will and self-determination.

*Brown*, 2015 WL 5568389, at ** 3-5.

Brown has not shown that the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law.  The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions.  *See Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988).  "A defendant is coerced when the totality of the circumstances shows that his will was 'overborne and his capacity for self-determination critically impaired[.]'" *Michael v. Butts*, 59 F.4th 219, 227-28 (6th Cir. 2023) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

Brown is not entitled to relief on this claim for several reasons.  First, Brown has not provided any basis for discarding the state court's determination that police did not question him during the first interview after he invoked his right to counsel and that he, not the police, initiated the second interview.  That determination rested upon a credibility finding by the state trial court – a finding that the officers were more credible on those points than was Brown – and a federal court on habeas review must generally defer to a state trial court's credibility determination. *See Davis v.*

*Ayala*, 576 U.S. 257, 274 (2015) ("[D]eterminations of credibility and demeanor lie peculiarly within a trial judge's province.") (quotation omitted).  Because this Court, "on the basis of a cold record," will not second-guess the trial court's credibility determination, Brown has failed to show that officers questioned him after he invoked his right to counsel. *Id.*

Next, Brown has not shown that the state court unreasonably rejected his claim that his statement was involuntary because the police engaged in trickery by lying to him, misrepresenting the amount and strength of the evidence, telling him that they did not believe he would be charged with murder, and using his mother as "leverage."  (ECF No. 1-1, PageID.118.)  Police trickery alone will not invalidate an otherwise voluntary statement. *See Frazier v. Cupp*, 394 U.S. 731, 737-39 (1969) (police misrepresentation of facts did not render an "otherwise voluntary confession inadmissible"); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir.1994) ("A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is.").  Indeed, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990).

Nor was it unreasonable for the Michigan Court of Appeals to conclude that Brown's statement was voluntary.  "[W]hen law enforcement has complied with

14

*Miranda*, [the court will] 'rare[ly]' hold that a defendant was induced to make a coercive statement." *Michael v. Butts*, 59 F.4th 219, 228 (6th Cir. 2023) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)). Here, Brown's inculpatory statement on May 2nd was made after the police advised him of, and he waived, his *Miranda* rights – the second time he had waived those rights.

It was also not unreasonable for the Michigan Court of Appeals to consider the timing of the alleged coercive police activity in relation to Brown's inculpatory statement. *See id.* at 231 (holding that the state court was not unreasonable in finding petitioner's confession was voluntary because, among other reasons, petitioner's inculpatory statement was made the day after the allegedly coercive police activity). Brown did not say anything after police, during the May 1st interrogation, raised the possibility of charging his mother with a crime. Instead, he immediately invoked his right to counsel. The state court did not unreasonably conclude that Brown understood his rights and was not afraid to invoke them.[2]

Likewise, it was not unreasonable for the state courts to credit the officers' accounts of the events leading up to Brown's confession or to consider the factors relevant to a totality of the circumstances analysis: Brown's age, education, and

---

[2] Brown's allegation that police also threatened to charge his mother during the May 2nd transport ride was found not credible by the trial court. Because the Court defers to the state court's credibility determination, Brown may not rely on that factual assertion to show coercion.

intelligence; the length of the questioning; and whether Brown was provided with necessities such as food, water, and sleep. *Brown,* 2015 WL 55568389 at ** 3-4. Finally, Brown has not persuaded the Court that the state court unreasonably held that the officers' other allegedly misleading statements, *e.g.*, that the interview was not being videotaped, did not rise to the level of coercive conduct which would invalidate his *Miranda* waiver. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (Miranda does not prohibit "mere strategic deception").

In sum, it was not unreasonable for the Michigan Court of Appeals to conclude that Brown's statement was voluntary.  The Court therefore denies Brown's first claim for habeas relief.

## B

The Court next turns to Brown's claim that the state trial court violated his right of confrontation and his right to present a defense when it limited the cross-examination of Detective Thomas at trial.  Brown sought to cross-examine Thomas about allegations that Thomas filed false affidavits and used improper interrogation techniques in unrelated cases. (*See* ECF No. 10-15, PageID.2315-2319.)  The trial court did not allow Brown to explore these issues on cross-examination because it concluded that there was a high probability of confusing the jury, the testimony was of limited probative value, and there were other means to challenge Thomas' credibility. (*See* ECF No. 10-16, PageID.2328-2330.)

16

Brown raised this claim on direct review in the Michigan Court of Appeals. That court denied the claim for many of the same reasons articulated by the trial court, including that the alleged misconduct presented a "great risk of confusing the issues or misleading the jury" and that Brown was able to attack Thomas' credibility in other ways. The Court of Appeals also noted that Brown failed to "demonstrate[] that the evidence was 'probative of truthfulness or untruthfulness' under [Michigan Rule of Evidence] 608(b) because he failed to provide Thomas's allegedly false affidavits or testimony for review below or on appeal." *Brown*, 2015 WL 5568389, at *6.

Brown is not entitled to relief on his claim that the trial court improperly limited his cross-examination of Thomas because even if the trial court did err in that regard, the error is not one that warrants habeas relief. In habeas proceedings, a federal court will not grant habeas relief unless an error "resulted in 'actual prejudice.'" *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). Under this standard, relief may be granted only if the federal court "'is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Here, the limitations placed on Brown's cross-examination of Thomas did not have a substantial and injurious effect or influence on the jury's verdict. Thomas'

testimony was not a significant focus of the prosecution's case.  Indeed, the key testimony implicating Brown was introduced through video of his police interview. In the video, Brown admitted meeting the four victims through Backpage.com and inviting them to his mother's home.  He admitted to smoking marijuana with the victims and, on two separate occasions, awaking to find the women deceased.  He further admitted to dragging their bodies to a vehicle, driving from Sterling Heights to Detroit with the bodies in the trunk, and abandoning the vehicles after setting fire to one.  In addition to Brown's own statement, the prosecution presented other evidence implicating Brown in the murders.  For example, a blood sample taken from a closet door in Brown's bedroom matched the DNA profile of victim Natasha Curtis, Brown could not be excluded as the source of DNA samples taken from under the fingernails of two victims, and cell phone data placed Hunt's and McCrary's phones in the area of Brown's home on the night they were killed.

The prosecution's closing and rebuttal arguments underscore that the vital evidence at trial were Brown's own statement and scientific evidence, not Thomas' testimony. *See Miller v. Genovese*, 994 F.3d 734, 744 (6th Cir. 2021) ("We have found inadequately confronted testimony harmful when the State refers to it in opening and closing statements, and otherwise indicates its importance to the State's case …").  During these arguments, the prosecutor focused on Brown's recorded statements and did not draw substantial attention to Thomas' testimony.  Thus,

because Thomas' testimony was not a significant part of the prosecution's case, the limitations on cross-examination did not "significantly undermine[] fundamental elements" of Brown's defense. *United States v. Scheffer*, 523 U.S. 303, 315 (1998).

Finally, Brown utilized other avenues available to him to question Thomas' credibility.  For example, Brown challenged Thomas' credibility by showing that aspects of Thomas' testimony at trial were inconsistent with statements Thomas' made at pre-trial hearings and/or during the recorded interrogations.

For all of the reasons explained above, Brown has not shown that the trial court's exclusion of this evidence had a substantial and injurious influence on the outcome of his case or influenced the jury's verdict.  Brown is therefore not entitled to habeas relief on this claim.

## C

Brown's third and fourth claims relate to Thomas' testimony at the *Walker* hearing.  Brown maintains that Thomas testified falsely at that hearing and that the prosecutor knew the testimony was false but did nothing to correct it.  Brown further claims his trial counsel was ineffective for failing to object to the testimony.

Brown raised the prosecutorial misconduct claim for the first time in his motion for relief from judgment that he filed in the state trial court.  That court rejected the claim because, on direct appeal, the Michigan Court of Appeals held that Thomas' contradictory statements were "'relatively minor inconsistencies'" that

did not "'appreciably undermine the trial court's conclusion that defendant voluntarily waived his *Miranda* rights.'" (ECF No. 10-30, PageID.3343.)  The trial court also held that the inconsistencies "would not have been material to the jury's determination of defendant's guilt." (*Id.*, PageID.3344.)

The trial court further explained its reasons for denying relief on this claim in its order denying Brown's motion for reconsideration:

> [I]t is well established that not all inconsistencies rise to the level of perjury.  *People v. Arnston*, 10 Mich. App. 718, 722-24; 160 N.W.2d (1968).  Moreover a conviction obtained through the knowing use of perjury must only be set aside if the perjured testimony could have affected the jury's judgment (*i.e.,* when the perjury is material to the defendant's guilt).  ...  Significantly, defendant acknowledges the Court of Appeals described the substance of his perjury allegations as minor inconsistencies.  The identified inconsistencies also involved collateral matters that were not material to a determination of defendant's guilt.
>
> Additionally, the Court of Appeals' determination that the minor inconsistencies in Detroit Police Detective Ernest Wilson's and Det. Thomas' testimony did not "appreciably undermine the trial court's conclusion that defendant voluntarily waived his *Miranda* rights", slip op. at 6, precludes a different outcome of the *Walker* hearing.

(ECF No. 10-30, PageID.3348).

Brown has not shown that the trial court's resolution of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  A prosecutor's conduct violates a criminal defendant's constitutional

rights only if the conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The "deliberate deception of court and jury by the presentation of testimony known to be perjured" violates a defendant's due process rights. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam). To prevail on such a claim, a defendant must show that the prosecution knowingly presented false testimony that materially affected the proceeding. *See United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989). But "mere inconsistencies" in the testimony are not enough. *Id.* A defendant must prove that the testimony was "indisputably false." *See id.* at 822-23. And claims of perjury must also survive a harmless-error analysis. *See Rosencrantz v. Lafler*, 568 F.3d 577, 583-84 (6th Cir. 2009).

Brown has not shown that the state court unreasonably denied this claim. The record supports the state court's conclusion that, while Thomas' *Walker* hearing testimony differed from his trial testimony and from recordings of the custodial interrogations, the inconsistencies were insufficient to establish the prosecutor's knowing use of false testimony *See Monea v. United States*, 914 F.3d 414, 421 (6th Cir. 2019) (holding mere inconsistencies were insufficient to sustain a claim of perjury). The *Walker* hearing transcript shows that Thomas frequently failed to recall certain specifics of the custodial interrogations. The fact that he later recalled

these specifics during trial does not render the earlier testimony perjured. Additionally, recordings of the May 1st and 2nd interviews were available to the trial court which allowed for an independent assessment of whether, and to what extent, Thomas' testimony was inconsistent. Brown has not shown that the state court's assessment of the significance of any inconsistencies was unreasonable. Finally, the trial court held the any inconsistencies would not have altered its decision on the admissibility of Thomas' statements. For all of these reasons, Brown has not shown that the trial court's rejection of this claim was unreasonable.

Brown also claims that his trial counsel was ineffective for failing to object to the prosecutor's alleged misconduct. Thomas says that he raised this claim in his state court motion for relief from judgment, but he did not. Instead, he raised an ineffective assistance of *appellate* counsel claim. (*See* St. Ct. Mot. ECF No. 10-22, PageID.3014-3019.) Therefore, this claim is unexhausted. Exhaustion is not a jurisdictional requirement, *McBride v. Skipper*, 76 F.4th 509, 516 n.5 (6th Cir. 2023), and an unexhausted claim may be decided if it is clearly meritless such that addressing it would be efficient and not offend federal-state comity. *See Prather v. Rees*, 822 F.2d 1418, 1422 (6th Cir. 1987) (habeas petition may be denied on merits despite failure to exhaust state court remedies).

The Court will address Thomas' ineffective assistance of trial counsel claim and deny it because it is meritless. A violation of the Sixth Amendment right to the

effective assistance of counsel is established where an attorney's performance was deficient, and the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To show prejudice under *Strickland*, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

As discussed above, Brown has failed to show that the state court's conclusion that the prosecutor did not engage in misconduct was unreasonable. And trial counsel is not ineffective for failing to object to conduct that was not improper. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."). Accordingly, because Brown has failed to show that his counsel could have raised a successful objection to the prosecution's conduct, his ineffective assistance of trial counsel claim must be denied.

## III

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse

to the applicant." A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court will deny Brown a certificate of appealability because jurists of reason could not debate the Court's conclusion that Brown failed to demonstrate an entitlement to habeas relief.

Although the Court declines to issue Brown a certificate of appealability, the standard for granting an application for leave to proceed *in forma pauperis* on appeal is not as strict as the standard for certificates of appealability. *See Foster v. Ludwick*, 208 F.Supp.2d 750, 764 (E.D. Mich. 2002). A court may grant *in forma pauperis* status on appeal if it finds that an appeal is being taken in good faith. *See id*. at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R. App. 24 (a). Although jurists of reason would not find it debatable that Brown failed to demonstrate an entitlement to habeas relief, an appeal could be taken in good faith. Therefore, Brown may proceed *in forma pauperis* on appeal.

**IV**

For the reasons set forth above, the Court **DENIES** the petition for writ of

habeas corpus (ECF No. 1) and **DENIES** Brown a certificate of appealability.

However, the Court **GRANTS** Brown leave to proceed *in forma pauperis* on appeal

because an appeal could be taken in good faith.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 3, 2024


I hereby certify that a copy of the foregoing document was served upon the
parties and/or counsel of record on September 3, 2024, by electronic means and/or
ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126