UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES CORNELIUS BROWN,

      Petitioner,

v.

                                Case No. 19-cv-10975
                                Hon. Matthew F. Leitman

LES PARISH,

      Respondent.

_____/

**ORDER (1) GRANTING IN PART AND DENYING IN PART PETITIONER'S MOTION TO ALTER OR AMEND THE JUDGMENT (ECF No. 25), (2) GRANTING IN PART AND DENYING IN PART PETITIONER'S MOTION TO FILE A SUR-REPLY (ECF No. 28), AND (3) GRANTING A LIMITED CERTIFICATE OF APPEALABILITY**

Petitioner James Cornelius Brown is a state prisoner in the custody of the Michigan Department of Corrections. On April 1, 2019, Brown filed a petition for writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254. (*See* Pet., ECF No. 1.) In the petition, Brown sought relief from his convictions of four counts of first-degree murder, two counts of disinterment, mutilation or carrying away of a human body, arson of real property, and arson of personal property. (*See id*.) Among his claims for habeas relief, Brown argued that his custodial statements were involuntary. On September 3, 2024, the Court denied the petition and denied a certificate of appealability. (*See* Order, ECF No. 23.)

1

Now before the Court is Brown's Motion to Alter or Amend the Court's Judgment.[1] (*See* Mot., ECF No. 25.) For the reasons explained below, Brown's motion is **GRANTED IN PART AND DENIED IN PART**. More specifically, the motion is **GRANTED** in that the Court will amend the judgment to grant a limited certificate of appealability on one issue. In all other respects, the motion is **DENIED**.

**I**

Brown seeks relief under Federal Rule of Civil Procedure 59(e). That rule allows a court to alter or amend its judgment based on: "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010). "A motion under Rule 59(e) is not an

---

[1] Respondent filed a response in opposition to the motion. (*See* Resp't's Br., ECF No. 27.) In that response, Respondent argued that the argument Brown presented in his motion (1) was procedurally defaulted and (2) failed on the merits. (*See id.*) Brown then filed a motion to file a reply (which he erroneously called a "sur-reply") or to strike Respondent's procedural default argument. (*See* Mot. ECF No. 28.) That motion is also pending before the Court. The Court **GRANTS** that motion to the extent that it seeks leave to file a reply. The Court **DENIES AS MOOT** the part of the motion seeking to strike Respondent's procedural default argument. The Court has the discretion to proceed directly to the merits of Brown's claims without considering Respondent's procedural default argument. *See Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) ("[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits."). The Court exercises that discretion here. Because the Court is not reviewing Respondent's procedural default argument, Brown's motion to strike that argument is moot.

opportunity to re-argue a case." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998). Instead, Rule 59(e) allows "the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008) (quotation omitted).

## II

In his motion to alter or amend the judgment, Brown argues that the Court erred when it denied his claim that a custodial statement he made to police on May 2, 2012 (the "May 2 Statement"), was improperly admitted into evidence at trial. Brown argues that the May 2 Statement should have been excluded for two reasons. The Court addresses each of Brown's arguments separately below.

### A

First, Brown asserts that the May 2 Statement was inadmissible because he unequivocally invoked his right to counsel on May 1, 2012, and the police did not thereafter re-advise him of his *Miranda* rights on May 2 when they obtained the May 2 Statement. (*See* Mot., ECF No. 25, PageID.4164.) This argument fails on the facts.

Following an evidentiary hearing, the state trial court found, contrary to Brown's contention, that the investigating detectives did re-advise Brown of his *Miranda* rights on May 2 *before* he made the May 2 Statement. (*See* St. Ct. Order, ECF No. 1-2, PageID.251.) The trial court also found that the detectives did not

3

interrogate Brown on May 2 until after he had initiated conversation with them and indicated a willingness to discuss the crime. More specifically, the trial court found the following facts:

1. Detectives interviewed Brown on May 1, 2012, and during that interview he invoked his right to counsel. (*See id.*, PageID.251.)

2. After he invoked his right to counsel, "the questioning stopped." (*Id.*, PageID.254)

3. Brown was detained at the Second Precinct on the night of May 1. (*See id.*, PageID.251)

4. On May 2, detectives picked Brown up at the Second Precinct to take him to the homicide office for DNA testing. (*See id.*)

5. During the drive to the homicide office, Brown told detectives "that he wanted to talk." (*Id.*, PageID.254.)

6. The detectives had not "interviewed or questioned" Brown on May 2 "prior to his statement that he wanted to talk and waive his rights." (*Id.*)

7. After Brown stated that he wanted to talk, detectives took him to "an interrogation room." (*Id.*, PageID.251.)

8. While in that room, Brown "reviewed and executed" a "constitutional rights certificate form." (*Id.*) That is a form that the Detroit Police department uses to inform a suspect "of his *Miranda* rights." (*Id.*, PageID.250.)

9. After Brown signed that form on May 2, he "then made" the May 2 Statement. (*Id.*, PageID.251.)

All of these factual findings are presumed correct on habeas review and may be rebutted only with clear and convincing evidence, which Brown has failed to provide. *See* 28 U.S.C. § 2254(e)(1). And these findings are fatal to Brown's

4

argument that he is entitled to relief because the detectives did not re-*Mirandize* him on May 2.[2]

In an attempt to rebut state trial court's factual finding and cast doubt on the admissibility of the May 2 Statement, Brown contends that the lead investigating officer, Detective Thomas, admitted that he did not re-advise Brown of his *Miranda* rights on May 2. (*See* Mot., ECF No. 25, PageID.4164, citing 4/18/2013 Hr'g Tr., ECF No. 10-6, PageID.1118.) That is not correct. In the portion of the testimony cited by Brown, Detective Thomas admitted that he did not re-*Mirandize* Brown while they were together in a police vehicle traveling from the Second Precinct to the homicide office. (*See* 4/18/2013 Hr'g Tr., ECF No. 10-6, PageID.1118.) But on the very next page of Detective Thomas' testimony, he (Thomas) said that once they arrived at the homicide office, he (Thomas) "began with the constitutional rights" and had Brown sign the constitutional rights waiver form just a "few minutes" after they started speaking. (*Id.*, PageID.1119.) Given this testimony from Detective Thomas, Brown has failed to show that the state trial court acted unreasonably when

---

[2] In addition, given the state trial court's finding that Brown initiated the discussion with detectives on March 2 and that he executed the *Miranda* waiver form that day before he made the March 2 Statement, he would be hard pressed to show any error in the admission of the March 2 Statement. *See Oregon v. Bradshaw*, 462 U.S. 1039 (1983) (holding that inculpatory statement made by suspect who had previously invoked right to counsel was admissible because statement was obtained after suspect initiated further discussions with police about the offense and where other circumstances did not cast doubt on suspect's waiver of his *Miranda* rights).

it found as a matter of fact that the officers did re-advise Brown of his *Miranda* rights on May 2 before obtaining the May 2 Statement.

For all of these reasons, the Court concludes that Brown is not entitled to habeas relief on his claim that the May 2 Statement was inadmissible because detectives did not re-advise him of his *Miranda* rights that day before obtaining the statement.

**B**

The Court next turns to Brown's second argument as to why the May 2 Statement should have been excluded. He says that the statement was inadmissible because he unequivocally invoked his right to remain silent during the May 2 interrogation, but the detectives nonetheless continued to interrogate him. (*See* Mot., ECF No. 25, PageID.4165-4174.) And he further contends that he made the inculpatory portion of the May 2 Statement after he asserted his right to remain silent.

This is a serious argument. It is undisputed that during the May 2 interrogation, Brown told the detectives, "I ain't going to say nothing." (*Id.*, PageID.4166.) And, as Brown accurately notes, federal courts have repeatedly found statements like that to be unequivocal assertions of the right to remain silent – assertions that require officers to immediately cease interrogating a suspect. (*See id.*, PageID.4167-4173.)

6

However, Respondent has persuaded the Court that, when read in context, Brown's statement that he "ain't going to say nothing" was not an assertion of his right to remain silent. Brown made his statement during the following exchange with the detectives:

> DET. IN WHITE SHIRT:   Have a seat right there.
>
> DEFENDANT BROWN:   So what I got to waive? Waive my rights to an attorney?
>
> DET. IN DARK SHIRT:   He's going to read you your rights, you know. You are doing the right thing, dawg. You are doing the right thing. Don't you feel a little better just getting it off you? It's a lot to carry on you, dawg.
>
> DEFENDANT BROWN:   I just feel like in a way you know (inaudible) man. Even though you all already assured me but – So what will I be charged with, sir.
>
> DET. IN DARK SHIRT:   Now, that I don't know. I don't know what you will get charged with because of what happened to you. We just get the information. And then it goes over to the prosecutor's office. I ain't going to lie to you. You don't lie to us, I'm not going to lie to you. Okay.
>
> DET. IN WHITE SHIRT:   I'm going to ask you some specific questions. Answer the question. You are going to write down and keep it moving. Just answer the question I ask you. All right; no more, no less. All right. I'm going to ask you a question now. I don't know your full name. So what is your full name.
>
> DEFENDANT BROWN:   James Cornelius Brown.

* * *[3]

> DET. IN WHITE SHIRT:      Let me get something for this. Calm down. Just calm down. Yesterday – Look at me. Yesterday you was talking in the same room. You got confused about things. That is what is going on. All right. You know, you asked for an attorney yesterday. You want to talk to me today? I'm going to ask you a question. Go ahead.
>
> DEFENDANT BROWN:      I ain't going to say nothing.
>
> DET. IN WHITE SHIRT:      Oh, okay. So you want to talk right now? What we talked about? Yes?
>
> DEFENDANT BROWN:      Yes, sir.

(ECF No. 10-15, PageID.2254–2255).

Respondent persuasively explains why, in the context of this exchange, Brown's statement was not an assertion of his right to remain silent:

> The key here is the fourth-to-last line. As shown, after gathering basic information about Brown, the detective made a series of statements, ending with him stating that he was going to ask Brown a question. (*Id.*, PageID.2254.) Instead of asking his question, however, he said to Brown, "Go ahead." (*Id.*) This prompt was a recognition that Brown was about to speak. As in a normal conversation (or an appellate oral argument, for example) when the speaker sees cues that the listener intends to interrupt, the speaker respectfully pauses to allow the listener to speak. Sometimes, the speaker even verbally invites the listener to speak by saying something like, "Go ahead." The

---

[3] A series of preliminary questions and answers gathering demographic-related information such as Brown's full name, address, height, weight, etc., have been omitted because they are not relevant to this discussion.

>  detective did so here: he paused and told Brown to "go ahead" and say whatever it was that Brown appeared to want to say. (*Id.*)
>
>  *That* is when Brown said, "I ain't going to say nothing." (*Id.*, PageID.2254–55.) Again, going back to normal conversation, that type of response is entirely common. In that situation, the speaker apparently misread what he thought was a cue from the listener that turned out to be nothing at all. So, the listener says something to the effect of, "Oh, no, I wasn't going to say anything." Then the speaker responds just as the detective did here, saying, "Oh, okay," acknowledging the mistake, and then goes back to what he was talking about before the interruption. In this case, the detective had intended to ask a question when he paused for Brown to speak, so that is where the detective returned, asking, "So you want to talk right now? What we talked about? Yes?" (*Id.*, PageID.2255.) Brown then answered in the affirmative. (*Id.*)
>
>  Just because Brown phrased the mistaken offer to speak as he did, in his own parlance ("I ain't going to say nothing"), does not change its meaning or convert it into an invocation of the right to remain silent. In any other context than a police interview, an ordinary listener would not take Brown's statement as an abrupt end to the conversation but as a polite correction of a mistaken cue.

(Resp't's Br., ECF No. 27, PageID.4212-4214.)

The Court agrees with Respondent's interpretation of Brown's exchange with the detectives. The Court adds that it is especially persuaded by the fact that immediately after Brown said that was going to say "nothing," the detective asked him if he wanted to talk about the crime, and he said that he *did* want to talk. In the Court's view, Brown would not have said that he *did* want to talk about the crime immediately after saying that he was going to say "nothing" if the "nothing" statement was truly meant to convey that he refused to discuss the crime and was an

9

assertion of his right to remain silent. Instead, the most reasonable explanation as to what Brown meant by the "nothing" statement is the one offered by Respondent.[4]

### III

For the reasons explained above, Brown's motion to alter or amend the judgment is **GRANTED IN PART AND DENIED IN PART** as follows:

1. The motion is **GRANTED** to the extent that it seeks to amend the Court's judgment to include a limited certificate of appealability.

2. The Court **GRANTS** a **LIMITED CERTIFICATE OF APPEALABILITY** as follows. Brown may appeal the Court's rejection of his argument that the state trial court should not have admitted the May 2 Statement because he asserted his right to remain silent – by saying that he "ain't going to say nothing" – before he made the statement. No other issue is included in the limited certificate of appealability.

3. In all other respects, the motion is **DENIED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: April 21, 2025

---

[4] There is no indication that the detectives placed any undue pressure on Brown between the time that Brown made the "nothing" statement and the time – almost immediately thereafter – that Brown agreed to talk. Thus, there is no reason to believe that Brown did assert his right to remain silent and that the detectives then did something that overcame his will and led him to speak to them.

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 21, 2025, by electronic means and/or ordinary mail.

                                                  s/Holly A. Ryan
                                                  Case Manager
                                                  (313) 234-5126